AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

for the

District of New Mexico

JUL 17 2024

MITCHELL R. ELFERS
CLERK OF COURT

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
2200 Holiday Ave Space 110 Las Cruces NM 88005 and
the vehicle and body of Raul Andrews Alvarado

)
)
)
)
)
)

Case No. 24-1339 MR

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Residence located at 2200 Holiday Ave Space 110 Las Cruces NM 88005 the vehicle and the body of Raul Andrews Alvarado, more fully described in Attachment A, which is attached and fully incorporated herein.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B, which is attached and fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Possession with intent to distribute a controlled substance |
| 21 USC 846 | Conspiracy to distribute controlled substance |

The application is based on these facts:
See Attachment C, which is attached and fully incorporated herein

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

James P Scott, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 17 Jul 2024

_____
*Judge's signature*

City and state:  Las Cruces

Damian L Martínez, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A-1**

*Property and Person to be searched*

The Subject Premises is a mobile home residence located at located at 2200 Holiday Ave, Las Cruces, New Mexico, 88005 in space number 110. The residence is located on the west side of Holiday Cir and is a grey with white trim and has a dark grey pitched roof. The front entry of the residence faces south and is on the south side of the residence. There is metal storage structure located on the southwest of the residence that is encompassed within the property line. The entrance to the property faces east towards Holiday Cir. All structures are listed within public records as being part of the subject premises of 2200 Holiday. The numbers "110" are marked on the exterior wall and entrance to the property. Based on physical surveillance, confidential source (CS) reporting, and law enforcement database checks, agents are aware that Raul Alvarado is currently residing at the Subject Premises.

The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, apparent connection or possession of an ignition key.

Biometric Access to Devices: During the execution of the search of the Subject Premises described herein, law enforcement officers are also specifically authorized to compel Alvarado to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the Subject Premises.

2.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

In addition to vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises, the 2020 white Chevrolet Camaro bearing NM RXF170 license plate that is registered to Raul Alvarado which was specifically observed being used as transport vehicles for narcotics purchases.









Alvarado, Raul Andrews

## ATTACHMENT B

### Items to be Seized

Evidence of violations of 21 U.S.C. §§ 841 and 846, including the following items:

1.  Any cellular telephones, digital tablets, personal digital assistant (PDA) devices or other communication devices and any and all information stored on such communication devices, including:

    a.  Phone numbers, names, usernames, email addresses, residential addresses, and other identifying information of customers, distributors, sources of supply, and other associates of the user of the communication devices;

    b.  Audio and video calls made to or from the communication devices, along with the duration and date and time each such communication occurred;

    c.  Any message logs or messages, whether sent from, to, or drafted on the communication devices, along with the date and time each such communication occurred;

    d.  The content of voice mail messages and audio and video messages stored on the communication devices, along with the date and time each such communication occurred;

    e.  Photographs or video recordings;

    f.  Information relating to the schedule, whereabouts, or travel of the user of the communication devices;

    g.  Information relating to other methods of communications, including the contents of those communications, utilized by the user of the communication devices and stored on the communication devices;

    h.   Bank records, checks, credit card bills, account information and other financial records; and

    i.   Evidence of user attribution showing who used or owned the communication devices, such as social media accounts, email addresses, messages, location information, photographs and videos, phonebooks, saved usernames and passwords, documents, and internet browsing history;

2. Records relating to the importation, distribution, and possession of controlled substances, including, but not limited to books, records, receipts, cell phones, cell phone records, notes, ledgers, notebooks, border crossing documents, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances including but not limited to cocaine;

3. Papers, tickets, notes, schedules, receipts including bill of sales for vehicles, registration and licensing of vehicles, license plates, vehicle titles, registration, documents, stickers, and other proof of ownership and tax compliance, driver's license, or proof of insurance and liability;

4. Financial documents, including but not limited to, credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union receipts, checking account records, cashier's checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money or assets;

5. Identification and personal records including address books, telephone directories, calendars, diaries, social security cards, lists of names, social security numbers and other personal identification, telephone and address books or papers of individuals involved in the trafficking of controlled substances;

6. Photographs, video recordings, slides, digital files, DVDs, CD-Rs, or other media containing images or video of individuals involved in the trafficking of controlled substance which demonstrate his/her involvement in drug trafficking as well as other notes, records, diaries, journals, emails, blog entries, which demonstrate involvement in drug trafficking;

7. Proceeds of an unlawful activity, including but not limited to, United States currency, jewelry, vehicles and other assets or financial records related thereto;

8. Documents, books and papers reflecting names, addresses and/or telephone numbers and lists pertaining to individuals involved in the trafficking of controlled substances, including but not limited to cocaine;

9. Diaries, purchase records, cash receipts and disbursement journals, inventory records and other records relating to the operation of controlled substance sales, repackaging, and redistribution in violation of 21 U.S.C. §§ 841 and 846;

10. United States currency, currency counting machines, precious metals, jewelry, financial instruments including stocks and bonds, and all other items of value, and all sales receipts for items of value, that evidence the proceeds from the smuggling, transporting or distribution of drugs.

11. Devices or objects utilized to account for proceeds related to violation of violation of 21 U.S.C. §§ 841 and 846, including but not limited to currency counting machines;

12. Controlled substances, drug paraphernalia, and packaging materials, including scales, plastic baggies, vacuum sealing machines, and tape;

13. Firearms and ammunition;

14. Valid or false identification documents, including drivers' licenses, social security cards, state identification cards and foreign identification documents;

15. Bills, notes, contracts, or other documents reflecting the ownership, subscription information or use or control of one or more telephones or the location to be searched;

16. Tools utilized in the alteration of motor vehicles to facilitate transporting narcotics in violation of 21 USC §§ 841 and 846 USC;

17. Safes, lock boxes, or other locked containers, in which the items in paragraphs 1 through 16 could be concealed.

## ATTACHMENT C

## AFFIDAVIT IN SUPPORT OF ORDER AUTHORIZING SEARCH WARRANT

I, James P Scott, being first duly sworn, hereby depose and state as follows:

1. This Affidavit is submitted in support of an order authorizing the entry into the Subject Premises, as more fully described below and in Attachment A to the Search Warrant Application, for the purposes of searching and seizing evidence of violation of 21 U.S.C. § 841(a)(1) (possession with the intent to distribute a controlled substance) and 21 U.S.C. § 846 (conspiracy to distribute controlled substances).

## INTRODUCTION

2. I am a Federal Bureau of Investigation (FBI) Special Agent currently assigned to the Albuquerque Division, Las Cruces Resident Agency and work closely with Las Cruces/Dona Ana Metro Narcotics (Metro Narcotics). I have been employed as a Special Agent of the FBI since January 2021. I am classified, trained, and employed as a federal law enforcement officer with statutory arrest authority charged with conducting criminal investigations of alleged violations of federal criminal statutes, including Title 18 and 21 of the United States Code.

3. My experience as a Special Agent includes but is not limited to; conducting physical and electronic surveillance; interviewing subjects, witnesses and victims; writing affidavits for and executing search warrants and arrest warrants; issuance of administrative and federal grand jury subpoenas; analysis of phone tolls and financial records; analysis of data derived from the use of pen registers, trap and traces, and wiretaps; and working with undercover agents and confidential informants.

4. Through my training and experience and in conversations with other experienced agents and TFOs, I know the following:

2

a.  Drug traffickers commonly keep books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances.

b.  Drug traffickers often amass large amounts of profits derived from their illegal drug trafficking activities.  Documents and other records pertaining to assets which are proceeds of the drug trafficking described herein would constitute evidence of the same drug trafficking.

c.  Drug traffickers often maintain large amounts of U.S. currency derived from illegal activities.

d.  Drug traffickers often maintain ledgers, account books and other papers detailing the receipt, storage, sale and distribution of drugs. These ledgers often contain amounts of drugs obtained by the organization, and accounting of payments of drug proceeds, including accounts receivable and accounts payable.

e.  Drug traffickers often maintain phone books, address books and other papers containing names, telephone numbers, and addresses of suppliers and purchasers of drugs. Drug traffickers will often write these documents in code and they maintain documents containing the key to their codes.

f.  Drug traffickers also often maintain documents or receipts for various services, such as bank statements, telephone bills, utility bills, vehicle repair, consumer goods purchases, all evidencing the disposition of illegal profits, the existence of "stash houses," and the existence of other assets derived from drug proceeds. Drug traffickers often maintain various documents evidencing ownership of assets such as real estate deeds, vehicle titles, and insurance policies.

g.  Drug trafficking is a "for profit business" and, as such, traffickers must maintain the types of documents described above so as to determine profitability and to track debts owed by and to the trafficker.

h.  Drug traffickers often keep photographs and videos of themselves and their co-conspirators, drugs, and their illegal profits.

i.  Drug traffickers often use surveillance cameras in and around their residences and locations where drugs are stored to detect law enforcement and to protect drugs and drug proceeds. These surveillance cameras can be capable of storing footage within the camera or on a separate storage device.

j.  Drug traffickers often maintain safes or deposit boxes where they store drugs, U.S. currency and other documents evidencing their drug trafficking. It is common knowledge that safe deposit boxes require the owner to keep the key to the safe deposit box.

k.  Drug traffickers often have in their possession firearms and ammunition to protect themselves, their drugs and the proceeds derived from the distribution of drugs from individuals who seek to rob them or from competing drug traffickers.

l.  Drug traffickers often maintain one or more cellular or "smart" telephones ("devices") which they utilize to further their drug trafficking. Drug traffickers use these devices to communicate operational directives and information concerning the conduct of the organization's illegal activities to other organization members, including their suppliers, distributors and other co-conspirators. I know, based upon my training and experience, that timely communication of information between organizational members is critical to the overall success of an organization's illegal activities. The critical nature of this information is derived from the necessity of the organization's management to provide

instructions for the importation, storage, transportation, and distribution of drug, as well as the subsequent laundering of the proceeds of these illegal activities.

m. I also know that some devices utilize subscriber identity module ("SIM") cards. A SIM card is a chip that is used to authenticate a device to a network. The SIM card generally contains subscriber information and authentication information, and it may contain contacts and encryption information. The portability of SIM cards in some devices allows a user to easily change devices, while maintaining the same telephone number, by removing the card from one device and inserting it into another. While SIM cards may have the capability to store some of the evidence described above, the storage capacity of devices tends to far exceed that of SIM cards. Which information is stored on the SIM card, on the device, or in both locations varies and depends on variables such as the user-defined settings on the device and the memory capacity of the SIM card. Accordingly, information pertaining to drug trafficking activity may be located on the SIM card itself, as well as the device in which the SIM card was inserted.

n. I further know from my training and experience that a cache of information including dialed, received or missed calls and messages sent, received or placed in draft status, can be found on these devices. I know that the identities and telephone numbers of other participants in the drug trafficking activity are maintained in the contact lists of these devices. In my experience, drug traffickers also use these devices to take and store photographs or video recordings of themselves with their co-conspirators and with contraband, including drugs, currency and firearms. Drug traffickers also use the GPS or location applications of these devices, which can reveal their whereabouts when they conducted or arranged drug related activities or travel. In addition, drug traffickers also

5

use these devices to store information related to the financial transactions that occur during the course of their drug trafficking, such as drug ledgers and financial accounts and transactions.  In my experience, the devices used by drug traffickers often contain evidence relating to their drug trafficking activities, including, but not limited to, contact lists, lists of recent call activity, stored text and voice mail messages, photographs and video recordings, GPS and location information, and financial accounts and records.  Information stored within a mobile device may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element, or, alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a mobile device (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the mobile device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. Information stored within a mobile device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation.  For example, information within the mobile device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the mobile device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

o.  Drug traffickers often maintain drugs, drug proceeds, ledgers and other documents related to drug trafficking, and firearms, in their primary residence or place of business and in their vehicles to afford them ready access to those items.

p.  Drug traffickers often conceal drugs, drug proceeds, firearms, and ammunition on the curtilage of their property, including buried underground and inside of vehicles, garages, storage sheds, and other unattached buildings, in order to prevent law enforcement or individuals who seek to rob them from discovering such items.

q.  Drug traffickers often place ownership of vehicles, real estate, telephones and other assets in nominee names and register utility services in nominee names to avoid law enforcement detection.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

5.  As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the Subject Premises, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

6.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs),

smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

7. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that

might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

8. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear that they may contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

9. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or

password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more

secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of

the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

10. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## SUBJECT PREMISES

11. The following information is based upon my personal knowledge, as well as information provided by other federal officers and is presented as probable cause to seek issuance of a search warrant allowing agents to enter and conduct a search of the property of 2200 Holiday Ave Spc #110, Las

Cruces, NM 88005 (the Subject Premises), and the person of Raul Andrews Alvarado (Alvarado) more fully described in Attachment A.

12. The Subject Premises is a mobile home residence located at located at 2200 Holiday Ave, Las Cruces, New Mexico, 88005 in space number 110. The residence is located on the west side of Holiday Ave and is a grey with white trim and has a dark grey pitched roof. The front entry of the residence faces south and is on the south side of the residence. There is metal storage structure located on the southwest of the residence that is encompassed within the property line. The entrance to the property faces east towards Holiday Cir. All structures are listed within public records as being part of the subject premises of 2200 Holiday. The numbers "110" are marked on the exterior wall and entrance to the property. Based on physical surveillance, confidential source (CS) reporting, and law enforcement database checks, agents are aware that Raul Alvarado is currently residing at the Subject Premises.

## PROBABLE CAUSE

13. This Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Facts presented in this Affidavit are based on my knowledge, observations, and direct participation in this investigation, as well as through conversations with other agents and/or persons involved in the investigation, and through the review of reports, and other documentation generated by myself and others during the course of this investigation and other related investigations.

14. The following information is presented as probable cause to search the Subject Premises. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every known fact regarding the immediate investigation. More specifically, I

have set forth only pertinent facts that I believe are necessary to establish probable cause to search the Subject Premises for evidence of violations of 21 U.S.C. § 841 and 21 U.S.C. § 846.

15. In November of 2023, the FBI and the Las Cruces/Doña Ana County Metro Narcotics Agency received new information through CS reporting indicating that Alvarado is distributing narcotics in Las Cruces, New Mexico.

16. Through the course of the investigation, agents learned that Alvarado currently resides at 2200 Holiday Ave Spc#110, Las Cruces, NM 88005.

17. In late May 2024, at the direction of agents, CS arranged to purchase Cocaine from Alvarado. CS met with Alvarado at a location in the city of Las Cruces. During the transaction the CS and Alvarado went to the CS vehicle and Alvarado facilitated the transaction at the vehicle. Alvarado provided CS with the suspected Cocaine in exchange for official government funds. Agents later tested the suspected Cocaine, which resulted presumptively positive for the presence of Cocaine. The following controlled-buy protocols were followed by agents for the transaction: 1) before the transaction agents met with the CS and searched the CS's person and vehicle for contraband; 2) the CS was provided with official government funds for the controlled buy; 3) agents followed the CS to and from the predetermined meeting location for the transaction; 4) agents conducted surveillance on the CS at the predetermined meeting location during the buy; 5) after the buy, agents met with the CS at a separate location and collected the evidence; and 6) after the buy, the CS's person and vehicle were again searched and agents debriefed the CS. No contraband was found on the CS's person or in the vehicle during the pre- or post-buy searches.

18. In early June 2024, again at the direction of agents, CS arranged to purchase Cocaine from Alvarado. During the transaction the CS and Alvarado went to the CS vehicle and Alvarado facilitated the transaction at the vehicle. Alvarado provided CS with the suspected Cocaine in

exchange for official government funds. Alvarado was observed leaving the deal in a Orange Dodge Charger with New Mexico License plate BTHJ73. Agents later tested the suspected Cocaine, which resulted presumptively positive for the presence of Cocaine. The following controlled-buy protocols were followed by agents for the transaction: 1) before the transaction agents met with the CS and searched the CS's person and vehicle for contraband; 2) the CS was provided with official government funds for the controlled buy; 3) agents followed the CS to and from the predetermined meeting location for the transaction; 4) agents conducted surveillance on the CS at the predetermined meeting location during the buy; 5) after the buy, agents met with the CS at a separate location and collected the evidence; and 6) after the buy, the CS's person and vehicle were again searched and agents debriefed CS. No contraband was found on the CS's person or in the vehicle during the pre- or post-buy searches.

19. In late June 2024, again at the direction of agents, CS arranged to purchase Cocaine from Alvarado. Physical surveillance was in place at Alvarado's residence at 2200 Holiday Spc. 110. Agents witnessed Alvarado arrive at subject location and enter the residence for approximately 2-3 minutes before exiting the residence. Alvarado then utilized the 2020 white Chevrolet Camaro bearing NM RXF170 license plate that is registered to him to drive to the transaction location. During the transaction, the CS and Alvarado went to the CS's vehicle and Alvarado conducted the deal for cocaine. Alvarado provided CS with the suspected Cocaine in exchange for US dollars. Agents later tested the suspected Cocaine, which resulted presumptively positive for the presence of Cocaine. The following controlled-buy protocols were followed by agents for the transaction: 1) before the transaction agents met with the CS and searched the CS's person and vehicle for contraband; 2) the CS was provided with official government funds for the controlled buy; 3) agents followed the CS to and from the predetermined meeting location for the transaction; 4)

agents conducted surveillance on the CS at the predetermined meeting location during the buy; 5) after the buy, agents met with the CS at a separate location and collected the evidence; and 6) after the buy, the CS's person and vehicle were again searched and agents debriefed CS.  No contraband was found on the CS's person or in the vehicle during the pre- or post-buy searches.

20. On 11 July, 2024, at the direction of the agents, the CHS conducted an additional purchase of Cocaine from Alvarado. Physical surveillance was in place at Alvarado's residence at 2200 Holiday Spc. 110. Alvarado was observed at the residence. Then Alvarado was observed utilizing the White Chevy Camaro bearing NM RXF170 license plate that is registered to him to drive to the meeting location with CHS. During the transaction Alvarado got out of his vehicle and went to the driver's side window of the CHS and Alvarado conducted the deal for cocaine. Alvarado provided CS with the suspected Cocaine in exchange for US dollars.

21. The CHS has consistently been corroborated through, but not limited to, other confidential source reporting, physical surveillance, and controlled buy operations. During all controlled buy operations, physical surveillance was conducted of the CHS by agents and no lapses in time occurred. To agents' knowledge, no information provided by CHS during the investigation of Alvarado by current agents has been shown to be false. CHS has charges to include, but not limited to, narcotics, aggravated burglary, aggravated battery, aggravated assault with a deadly weapon, and alien smuggling offenses. CHS is cooperating for possible consideration on potential charges for narcotics trafficking and firearms-related offenses.

22. Based on the foregoing, I believe that there is probable cause to believe that evidence of violations of 21 U.S.C. § 841 and 21 U.S.C. §846, as more particularly described in Attachment B, will be found at the Subject Premises and on the persons of Raul Andrews Alvarado.

**CONCLUSION**

23. I submit that this affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A and seize the items described in Attachment B.

24. Assistant United States Attorney Ry Ellison reviewed and approved the facts in the search warrant filed above.

Respectfully submitted,

James P Scott
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this
17 day of July 2024.

Damian L Martinez
United States Magistrate Judge